### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| TOMMY LEFTWICH | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. |
| vs. | ) | |
| | ) | |
| CITY OF PITTSBURG, KANSAS | ) | |
| MEGAN FRY | ) | |
| MENDY HULVEY | ) | |
| DARON HALL | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT[1]

Plaintiff complains against the above named Defendants as follows:

## I.   THE PARTIES.

1.   Plaintiff is a citizen of the United States and resident of Crawford County, Kansas.

2.   Defendant City of Pittsburg, Kansas (hereinafter sometimes referred to as "City") is a municipal corporation and political subdivision of the State of Kansas.

3.   Defendant Megan Fry, at all times pertinent hereto, was the Director of Human Resources for the City, she is a resident of the State of Kansas, and she is sued in her individual capacity.

4.   Defendant Mendy Hulvey, at all times pertinent hereto, was the Chief of Police for the City, she is a resident of the State of Kansas, and she is sued in her individual capacity.

---

[1] Plaintiff is waiting on a Right to Sue letter from the Department of Justice as to claims pursuant to Title VII. Once the letter is received, Plaintiff will amend this Complaint to include his claims pursuant to Title VII.

5.      Defendant Daron Hall, at all times pertinent hereto, was the City Manager for the City, he is a resident of the State of Kansas, and he is sued in his individual capacity.

## II.     JURISDICTION AND VENUE.

6.      The jurisdiction of the Federal Court is invoked because the claims of the Plaintiff arise under the statutes and laws of the United States, namely 42 U.S. Code §§ 1983, and 1988.

7.      Venue in the United States District Court for the District of Kansas is proper because Kansas is where the claims arose.

## III.    STATEMENT OF FACTS.

8.      Plaintiff was hired by the City in January, 2011 as a police officer.

9.      Prior to becoming a police officer with the City, Plaintiff spent nine years in the United States Army where he gained experience in international law enforcement affairs and also served as a combat medic and an EMT.

10.     During his employment with the City, Plaintiff was promoted and assisted in the training of new officers.

11.     In January of 2013, Plaintiff was present in the Report Room (room where officers complete their police reports at computer terminals) when a female officer shared information with Plaintiff and another fellow male officer about harassment by three different supervising officers in the Department.

12.     Several months later in 2013, Plaintiff requested a meeting with Hulvey and during the meeting he shared information about one of the female officers (who had previously complained of sexual harassment) was now involved in a romantic relationship

with a supervising officer.

13.    In the same 2013 meeting with Hulvey, Plaintiff told her about another female officer who also was involved in a romantic relationship with another supervising officer.

14.    Plaintiff told Hulvey he believed the relationships could be the result of sexual harassment, which was rampant in the Department, and that Hulvey should have the situation investigated.

15.    Plaintiff told Hulvey he believed the female officers in the relationship were receiving preferential treatment because of the relationships and this, in turn, was discriminatory toward other officers (including Plaintiff) who were not involved in the relationships.

16.    Despite the City's written policies on mandatory reporting and investigation of harassment and discrimination, Hulvey did not report Plaintiff's allegations to the City's Human Resources Department, and she otherwise did nothing about the allegations, presumably assuming the relationships between the female officers and supervisors were voluntary and not something Plaintiff should be concerned with.

17.    In the Fall of 2013, Plaintiff increasingly became concerned about the rampant sexual harassment occurring in the Department, and the fact that no one was doing anything about it.

18.    One of many concerns Plaintiff had at the time was information he was receiving which strongly suggested one of the relationships between a female officer and a supervising officer was not consensual  --  as apparently was the assumption made by Hulvey --  but instead was the result of unwanted advances by a supervising officer who had made

the same advances to other subordinate females in the Department.

19.    Concerned that the female officer would not be comfortable in telling her superiors the truth about the relationship, Plaintiff asked the female officer if she would tell the truth if asked about the supervising officer who was harassing her.

20.    In response to Plaintiff's question to her, the female officer started confiding with Plaintiff and fellow and senior officer Mike Paasch about the harassment she had experienced from the supervising officer.

21.    Officer Paasch and Plaintiff shared and discussed the information each of them was learning from the female officer.

22.    Part of the information learned by Plaintiff was that, back in 2012, the supervising officer had chosen the female officer to work with him at a local bar called "The Jungle" to catch underage drinkers.

23.    Plaintiff remembered the evening because he was at the police station in 2012 when the female officer was brought in and required to blow into a PBT machine, which registered her intoxication level at .183, more than double the legal limit to drive in Kansas.

24.    What was believed at the time in 2012 to be an incident of the female officer voluntarily drinking too much while working the bar with her supervising officer, now was being described by the female officer as a situation where her supervising officer was intentionally trying to get her intoxicated to take advantage of her, and he did in fact take advantage of her.

25.    The female officer also shared that when her supervising officer found out about the question Plaintiff had asked her (i.e. would she tell the truth if asked about the

nature of their relationship), the supervising officer sent the female officer a text pleading with her not to disclose anything because he had a family and house that he would lose if the female officer revealed anything.

26.    After learning of the information from the female officer, Plaintiff and Officer Paasch became concerned that what the female officer was describing may constitute criminal conduct by the supervising officer.

27.    Officer Paasch and Plaintiff encouraged the female officer to report what she had shared with them, but the female officer was concerned about retaliation and feared nothing would be done even if she did make a report.

28.    In late January of 2014, Plaintiff reached out to Fry to talk to her about the serious issues he was now aware of in the Police Department, asked her what he should do, and expressed to her he was concerned about retaliation if he shared the information.

29.    Ultimately, Plaintiff told Fry he would be back in touch with her about making a report and sharing the information he had.

30.    On February 1, 2014, Plaintiff emailed Fry, indicating he wanted to set up an appointment so he could share with Fry the information he had.

31.    Plaintiff was scheduled to meet with Fry on February 7, 2014.

32.    On the day before he was to meet with Fry (February 6, 2014), Plaintiff reached out to Hulvey to tell her about his scheduled meeting with Fry, and asked Hulvey if she would meet with him before the meeting with Fry.

33.    Plaintiff and Hulvey met on February 6, 2014 at a Starbucks' coffee shop, and during this meeting Plaintiff indicated to Hulvey, among other things, that things had gotten

worse since the first time he had complained to her in 2013, he expressed frustration that Hulvey had done nothing based on Plaintiff's first complaint, he shared all of the information he had learned about the sexual harassment suffered by female officers in the Department, he provided all of the details he knew about the supervising officer taking advantage of the subordinate female officer at the bar in 2012 (and included the possibility that what happened may have been a crime by the supervising officer), and again reiterated that he believed he was being treated unfairly due to the inappropriate relationships, although he now knew they were not consensual but instead the result of sexual harassment.

34.     During the February 6, 2014 meeting, Hulvey told Plaintiff she didn't have time to be concerned with the Patrol Unit (where the inappropriate relationships and misconduct had occurred, and was continuing to occur), which she indicated was the responsibility of two of her supervising officers.

35.     Hulvey ended the February 6, 2014 meeting by indicating that, given the information Plaintiff had shared, she would need to report the information, to which Plaintiff responded that she should have reported the information the first time he complained to her back in 2013.

36.     On February 7, 2014, Plaintiff had a lengthy meeting with Fry, wherein he shared all of the information he had previously shared with Hulvey and he indicated to Fry that he wanted something done about what was going on, and what he had reported.

37.     Fry took notes throughout the February 7, 2014 meeting, and the meeting ended with indication from Fry that she would investigate and address the information provided by Plaintiff.

38.     Soon after leaving the February 7, 2014 meeting with Fry, Plaintiff started hearing comments from people in the Department indicating that Plaintiff was trying to make a big deal out of nothing more than consensual relationships, it was none of his business, and that people should watch what they say around Plaintiff.

39.     On February 10, 2014, Plaintiff sent an email to Fry indicating that he already was hearing about things he had discussed with Fry, given this he questioned if the information he had provided could be handled "impartially and fairly", and he requested a meeting with the City Manager (Daron Hall) to discuss his concerns.

40.     On the next day, February 11, 2014, Fry told Plaintiff he should put his concerns in writing and get them to her by 3:00 p.m. the following day, and in the same email, Fry informed Plaintiff she had scheduled a meeting for him to attend with Hall, Fry, and Hulvey at Hall's office.

41.     Because many, if not most, of Plaintiff's complaints concerned Hulvey's lack of response to Plaintiff's complaints, and her knowing allowance of systemic sexual harassment and discrimination in her Department, Plaintiff did not feel comfortable having the discussion about all of his complaints with Hulvey in the same room.

42.     On February 18, 2014, Plaintiff emailed Fry, telling her he needed to cancel the meeting she had set up at the City Manager's office, as he had not been told who would be in the meeting, and he noted to Fry that he had already heard several officers and supervisors in the Department "speaking negatively about [him] and [his] reasons for coming to see [Fry]". (brackets added).

43.     On February 18, 2014, Plaintiff was aware that none of the individuals

7

involved in the misconduct, or victimized by the misconduct  --  that he had reported back

on February 6 and 7  --  had been interviewed, investigated, or even talked to, which Plaintiff

believed represented another instance of inaction as to extremely serious issues and conduct

in the Police Department.

44.     On February 18, 2014, Plaintiff shared his concerns about the information he

had, and the inaction on the part of the City, by writing a letter to each member of the City

Commission, with the subject of the letter reading: "Request for meeting to discuss serious

concerns of policy and moral issues with in[sic] Police Department". (*See* **Exhibit A**).

45.     The Mayor at the time, Monica Murnan, responded to Plaintiff by telling him

he should follow the "recommendations of the HR Director". (*See* **Exhibit A**).

46.     Plaintiff responded to Ms. Murnan on February 21, 2014 by sharing the

frustration he was feeling on account of Fry doing nothing, the retaliation he was enduring

because of his meeting with Fry, and he ended his response by suggesting that perhaps the

correct next step was to notify the "AG office" [Attorney General's office] and the

community. (*See* **Exhibit A**).

47.     On February 21, 2014, Plaintiff reached out to the Crawford County Attorney

--  who regularly used the supervising officer (involved in the bar incident with the female

subordinate officer) as a witness in cases he was prosecuting  --  and shared with him all of

the information about what was going on at the City Police Department, including the

question of whether the conduct by the supervising officer constituted a crime.

48.     The County Attorney informed Plaintiff (on February 21, 2014) he was going

to notify the Kansas Bureau of Investigation ("KBI") as he (the County Attorney) believed

the KBI would want to investigate what was being shared.

49.     Later in the day on February 21, Hall and the County Attorney were seen arriving and leaving Hulvey's office and, upon information and belief, his (the County Attorney's) purpose there was to inform Hall and Hulvey of what Plaintiff had told him.

50.     On February 22, 2014, Plaintiff was summoned by Hulvey (via Officer Paasch) to the office and, once there, he was told he was no longer an employee of the City, and this was effective immediately.

51.     Two separate times while in Hulvey's office, Plaintiff asked Hulvey why he was terminated, but he was given no response.

52.     Plaintiff received no warnings, counseling, or notices about his job performance or being terminated, leading up to the February 22, 2014 termination meeting.

53.     After Plaintiff left Hulvey's office, Hulvey told Officer Paasch [who had summoned Plaintiff at Hulvey's request, and who was in the termination meeting] that "it would be in [his] best interest not to talk to [Plaintiff] or to have anything to do with [Plaintiff]." (brackets added).

54.     At 7:47 a.m. on February 22, 2014, Hulvey addressed an email to the entire Police Department, Fry, Hall, and the City Attorney, with the following announcement: "Effective immediately, Officer Tommy Leftwich is no longer employed by the City of Pittsburg Police Department." (**Exhibit B**).

55.     Later in the day on February 22, 2014, Hulvey faxed a letter to Plaintiff's home stating, in pertinent part: "This letter is to confirm the termination of your employment from the Pittsburg Police Department effective today, February 22, 2014."

(**Exhibit C**).

56.    On February 27, 2014, Plaintiff appealed the decision to terminate his employment (**Exhibit D**) but, given the fact that he wasn't provided a reason for his termination, Plaintiff had no way of knowing what he was contesting, what evidence to offer or point to, or what witnesses to present.

57.    On March 3, 2014, the two female officers who had indicated they were sexually harassed (which was reported by Plaintiff) informed Hulvey of the harassment and, when they did, Hulvey asked them if Plaintiff had "coerced them to come forward".

58.    Both of the female officers indicated they had not been coerced but rather -- knowing that Plaintiff had already disclosed the harassment to Hulvey -- they had confidence in coming forward, even though they still feared reprisal for coming forward.

59.    On March 4, 2014, Plaintiff was told by Fry that he needed to be at City Hall the next day at 1500 hours to meet with Hulvey to talk about his appeal of the termination decision.

60.    The March 5, 2014 meeting started with Fry ordering that any recording devices needed to be turned off and, when Plaintiff asked why he couldn't record the meeting, Fry smirked and said she didn't feel like being recorded.

61.    Fry read aloud Plaintiff's appeal letter at the March 5, 2014 meeting, and then Hulvey took over by indicating she didn't agree with the reasons in the letter and she was ruling to uphold the termination decision.

62.    Following Hulvey's announcement that she would be upholding the termination, Plaintiff asked if he could defend his actions of reporting misconduct, share

details of the harassment, the unfair working conditions, and why all of it was intolerable, but Hulvey indicated she "had heard all she needed to hear", and that "we could talk for hours and still not agree".

63.    At the March 5, 2014 appeal meeting, Plaintiff then asked if he would ever be told the specific reason for his termination, to which Hulvey and Fry both indicated (with a demeanor suggesting they were glad Plaintiff asked) "it was due to insubordinate actions, and since [we've] been investigating the allegations it's come to our attention that you [Plaintiff] are guilty of an unauthorized investigation". (brackets added).

64.    Other than being given the distinct impression that the complaints he made and concerns raised were of no interest to Fry or Hulvey and would not be acted upon, Plaintiff had never been told (by anyone associated with the City) he was doing anything insubordinate or unauthorized.

65.    On March 6, 2014, Hulvey informed the City Police Department that the supervising officer involved in the 2012 bar incident, and accused of sexually harassing multiple female officers, was no longer employed by the City, however, unlike Plaintiff, the supervising officer was allowed to resign in lieu of being terminated.

66.    On March 11, 2014, Hulvey sent a letter to Plaintiff admitting that the first time Plaintiff was told the reason for his termination was during Plaintiff's appeal hearing, which was 10 days after he was terminated. (**Exhibit E**).

67.    Hulvey's March 11, 2014 letter (which constitutes a permanent part of Plaintiff's personnel file maintained by the City) indicated the grounds for Plaintiff's termination "included acts of insubordination, conducting an unsanctioned and

11

unauthorized professional standards investigation, and, creating a hostile work environment, through [Plaintiff's] actions and conduct; acts which constitute policy violations of both the Pittsburg Police Department and City of Pittsburg." (**Exhibit E**).

68.     The letter went on to say: "Further, your creation of a hostile and threatening work environment for other employees within the agency required your immediate separation from employment." (**Exhibit E**).

69.     On March 19, 2014, Plaintiff appealed Hulvey's March 11, 2014 decision to the City Manager, and in his appeal letter he indicated he was not given a fair opportunity to be heard at the March 5, 2014 meeting. (**Exhibit F**).

70.     On March 26, 2014, Plaintiff met with Hall concerning Plaintiff's appeal of his termination, and during the meeting Hall indicated to Plaintiff that the alleged insubordination Plaintiff was terminated over was Plaintiff making entities (outside of the Police Department) aware of his complaints and concerns connected with the City Police Department.

71.     On March 31, 2014, Hall indicated to Plaintiff that the information shared by Plaintiff during the March 26th meeting was not sufficient to change the original decision of termination and, therefore, Plaintiff's appeal was denied and made final. (**Exhibit G**).

72.     Three days later, on April 3, 2014, Fry communicated to all employees of the Police Department that there would be mandatory training on sexual harassment::

> Harassment Training
> REQUIRED for all City of Pittsburg
> Police Department staff

(**Exhibit H**).

73.     The City's regulations [governing the employment of Plaintiff, and other City employees] indicate the following as to the procedure to be followed when the City involuntarily terminates a City employee:

> When a supervisory determines that a significant deficiency in work performance exists or misconduct has occurred, which in the judgment of the supervisor or Department Head justifies a recommendation for termination, the Department Head shall:
>
> 1.  Meet with Human Resources and the City Manager to discuss misconduct or performance deficiency and intent to terminate the affected employee.
> 2.  Notify the employee of intent to terminate and reason(s) justifying the decision.
> 3.  Give the employee an opportunity to refute the facts or argue against the proposed action.
> 4.  Consult with the City Manager and Human Resources;
> 5.  Notify the employee of the outcome in writing;
> 6.  Notify the employee in writing of their right to file a disciplinary appeal.

(**Exhibit I**).

74.     The City's regulations [governing the employment of Plaintiff, and other City employees] indicate that, once notified by an employee of unlawful discrimination, "[t]he City will immediately undertake an effective, thorough and objective investigation." (**Exhibit J**).

75.     The City's regulations [governing the employment of Plaintiff, and other City employees] indicate that "[t]he City will not retaliate against any employee for reporting discrimination and will not permit retaliation against employees by the supervisor, department head or co-workers." (**Exhibit J**).

76.     The City's regulations [governing the employment of Plaintiff, and other City employees] indicate that "[a]ny employee . . . who has experienced or witnessed sexual harassment is required to report it." (**Exhibit K** at pg. 123).

13

77.     The City's regulations [governing the employment of Plaintiff, and other City employees] indicate "[i]t is the responsibility of administrators, and supervisors to report complaints of sexual harassment which they receive and of possible sexual harassment of which they become aware." (**Exhibit K** at pg. 123).

78.     The City's regulations [governing the employment of Plaintiff, and other City employees] indicate that:

> City policy and Federal law prohibit any form of retaliation against a person who makes a sexual harassment complaint, participates in an investigation of sexual harassment, or participates in formal grievance or disciplinary procedures. Retaliation against complainant or witness is, in itself, a violation of City policy and the law, and is a serious separate offense.

(**Exhibit K** at pg. 124).

79.     The City's regulations [governing the employment of Plaintiff, and other City employees] indicate that:

> Individuals who make complaints of sexual harassment and individuals who are accused of sexual harassment are entitled to due process and to a fair and prompt resolution of the complaint.

(**Exhibit K** at pg. 125).

80.     The City's regulations [governing the employment of Plaintiff, and other City employees] indicate that:

> An employee who receives disciplinary action may ask for an appeal. Appeals are granted to guarantee that the employee has his/her employment concerns reviewed and responded to in a timely and appropriate manner in accordance with established City policies and procedures.
> An employee shall not be retaliated against for raising concerns of this nature brought forward with a good faith belief that a problem exists.

(**Exhibit L** at pg. 131).

81.     The City's regulations [governing the employment of Plaintiff, and

14

other City employees] indicate that, as to an appeal taken to the City Manager:

> The City Manager or his/her designee will review the entire record (decision, corrective action, recommendation, appeal process) and issue a final and binding written decision within seven (7) working days.

(**Exhibit L** at pg. 133).

## IV.   PLAINTIFF'S FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS FOR FIRST AMENDMENT RETALIATION: CONSTITUTIONAL AND CIVIL RIGHTS VIOLATION PURSUANT TO 42 U.S.C. §§ 1983(3), 1988; RETALIATION AGAINST PLAINTIFF FOR HIS EXERCISE OF PROTECTED FIRST AMENDMENT SPEECH.

82.    Plaintiff incorporates all of the Paragraphs stated herein above.

83.    As outlined above, Plaintiff engaged in speech (both written and verbal) concerning serious misconduct by police officers and superiors at the City Police Department.

84.    Plaintiff's speech concerned matters of great public concern, to include police misconduct, failures of superiors to investigate and prevent the violation of civil and criminal laws, and failures to investigate or address claims of alleged unlawful discrimination, harassment, and retaliation.

85.    Plaintiff's protected speech went beyond concerns for his own personal self and his own personal employment situation, and included matters that affected the community at large, and City residents and taxpayers.

86.    In speaking to the City Commission, and its individual members, Plaintiff was engaging in speech as a citizen and not merely as an employee of the City Police Department.

87.     In speaking to and reporting misconduct in the Police Department to entities and persons outside of the City, Plaintiff was engaging in speech as a citizen and not merely as an employee of the City Police Department.

88.     Defendants[2] engaged in retaliation against Plaintiff for his protected speech, to include failing to abide by its own policies with respect to discipline and termination, terminating his employment, placing erroneous and defamatory allegations and documents in his permanent record and file at the City, and disparaging his name and reputation within the City Police Department and City of Pittsburg.

89.     In engaging in the retaliation against Plaintiff, Defendants Hulvey, Fry, and Hall were given final decision making authority (expressly and by their positions) by the City, they knew of the retaliatory conduct and personally facilitated it, they approved it, or at the very least turned a blind eye to it for fear of what they might discover, and all of this was done under the color of State law.

90.     In engaging in the retaliation against Plaintiff, Defendants Hulvey, Fry, and Hall, in their individual capacities, acted with malice and in reckless disregard of Plaintiff's rights, and engaged in willful, wanton, and fraudulent conduct by fabricating reasons for termination, and concealing the real reason (i.e. retaliation for Plaintiff engaging in protected speech) for termination.

91.     All Defendants are liable to Plaintiff for compensatory damages, including lost wages and benefits, emotional distress damages, attorney fees, and prejudgment and post

---

[2] Because Hulvey, Fry, and Hall were placed in positions of authority with the ability to make decisions and enact policy on behalf of the City of Pittsburg, the City is properly included as a Defendant.

16

judgment interest, and Defendants Hulvey, Fry, and Hall (in their individual capacities) are liable to Plaintiff for punitive damages.

**WHEREFORE,** Plaintiff seeks all remedies available pursuant to 42 U.S.C. §§ 1983 and 1988, including but not limited to a cease and desist order, a proclamation that police officers who report other police officers for misconduct will not be retaliated against, letters of good reference, compensatory damages, reinstatement to the position he held before his termination, lost wages and benefits (including future lost wages and benefits), attorney fees and costs, punitive damages (but only against Hulvey, Fry, and Hall in their individual capacities), and for such other and further relief as the Court deems just and equitable.

**V.     PLAINTIFF'S SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS: CONSTITUTIONAL AND CIVIL RIGHTS VIOLATION PURSUANT TO 42 U.S.C. §§ 1983, 1988; FAILURE OF DUE PROCESS IN FAILING TO PROVIDE PLAINTIFF A NAME-CLEARING HEARING.**

90.     Plaintiff incorporates all of the Paragraphs stated herein above.

91.     Defendants Hulvey, Fry, and Hall, in their individual capacities, and the City, gathered, schemed, and fabricated reasons for terminating Plaintiff's employment (all under the color of State law) in order to conceal their common purpose of retaliating against Plaintiff for exercising his First Amendment rights.

92.     Defendants' failure to provide any notice to Plaintiff of why he was being terminated (as is required by the City's own regulations), and then, after the termination, providing reasons that were fabricated, defamatory, and used as a pretext for retaliation, mandated that Defendants provide Plaintiff a name-clearing hearing.

93.     Although Defendants allowed Plaintiff to appeal the decision to terminate, they failed to allow Plaintiff a hearing to fully present his side of things, to contest the

reasons belatedly provided to Plaintiff as a basis for his termination, and to present evidence and witnesses, all in an effort to clear his name of the defamatory, false and pretextual reasons for his termination.

94.     On information and belief, Defendants have placed all of the above referenced documents (containing the defamatory, false, and pretextual reasons for Plaintiff's termination) into Plaintiff's permanent employment file maintained by the City.

95.     On information and belief, Defendants have published the above referenced documents (and the information contained therein) to other law enforcement agencies and employers that Plaintiff has made application to, thereby adversely affecting Plaintiff's reputation and ability to secure employment equal or superior to the position he had with the City.

96.     On information and belief, Defendants have published the above referenced documents (and the information contained therein) to residents of the City and the community in and around Pittsburg, Kansas, thereby adversely affecting Plaintiff's reputation and character, and bringing dishonor to Plaintiff and his family.

97.     Plaintiff has been damaged, and will continue to be damaged in the future, by Defendants' above referenced actions, to include stifling his ability to secure alternate and comparable employment, severely damaging his reputation within the Pittsburg, Kansas and surrounding community, and placing a black mark on his otherwise exemplary service in law enforcement and the United States military.

**WHEREFORE,** Plaintiff seeks all remedies available pursuant to 42 U.S.C. §§ 1983 and 1988, including but not limited to a cease and desist order, removal of the above-

referenced documents and information from any files maintained by the City as to Plaintiff's employment as a police officer, an injunction against Defendants forbidding them from disclosing the above-referenced documents and information, letters of good reference, providing Plaintiff a name-clearing hearing, attorney fees and costs, and for such other and further relief as the Court deems just and equitable.

## IX.    DEMAND FOR JURY TRIAL.

Plaintiff hereby demands a trial by jury for the foregoing causes of action.

## VII.    DESIGNATION OF PLACE OF TRIAL.

Plaintiff hereby requests that the trial be held at Kansas City, Kansas.

Respectfully submitted:

**REAVEY LAW LLC**

By:   /s/ Patrick G. Reavey                    .
        Patrick G. Reavey KS# 17291
        Kevin C. Koc KS# 24953
        Livestock Exchange Building
        1600 Genessee Suite 303
        Kansas City, MO 64102
        Ph: 816.474.6300
        Fax: 816.474.6302
        Email: preavey@reaveylaw.com
        Email: kkoc@reaveylaw.com
        Website: www.reaveylaw.com